J-S32019-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: A.G.M., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: N.W.M., FATHER | |
| | No. 828 MDA 2022 |

Appeal from the Decree Entered April 28, 2022
In the Court of Common Pleas of Luzerne County Orphans' Court at
No(s): A-9177

BEFORE: PANELLA, P.J., BENDER, P.J.E., and LAZARUS, J.

MEMORANDUM BY BENDER, P.J.E.: **FILED OCTOBER 14, 2022**

N.W.M. (Father) appeals from the decree entered on April 28, 2022, that granted the petition filed by A.M.W. (Mother) and C.T.B. (Stepfather) to involuntarily terminate Father's parental rights to A.G.M. (Child), born in July of 2013. After review, we affirm.

In his brief, Father sets forth the following two issues for our review:

[I.] Whether the [t]rial [c]ourt abused its discretion and/or committed an error of law in determining the parental rights of [Father] to the subject minor child, A.G.M., should be terminated pursuant to 23 Pa.C.S.[] § 2511(a)(1).

[II.] Whether the [t]rial [c]ourt abused its discretion and/or committed an error of law in determining the tenets of 23 Pa.C.S.[] § 2511(b) have been satisfied and the best interests of the subject minor child, A.G.M., served by terminating the parental rights of [Father].

Father's brief at 4.

We review an order terminating parental rights in accordance with the following standard:

When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009) (quoting *In re S.H.*, 879 A.2d 802, 805 (Pa. Super. 2005)). The burden is upon the petitioner to prove by clear and convincing evidence that its asserted grounds for seeking the termination of parental rights are valid. *R.N.J.*, 958 A.2d at 276. Moreover, we have explained that:

The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

*Id.* (quoting *In re J.L.C. & J.R.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003)). The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence. *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004). If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result. *In re Adoption of T.B.B.*, 835 A.2d 387, 394 (Pa. Super. 2003).

We have reviewed the certified record, the briefs of the parties, the applicable law, and the comprehensive opinion authored by the Honorable Jennifer L. Rogers of the Court of Common Pleas of Luzerne County, Orphans' Court Division, filed on July 6, 2022. We conclude that Judge Rogers' well-reasoned opinion properly disposes of the two issues raised by Father. Of particular note, Father's arguments center on the credibility determinations made by the trial court, contending that his testimony should have been believed rather than the testimony given by Mother and Stepfather. However, the trial court stated a number of times in its opinion that Father's testimony was inconsistent and not credible and that he contradicted himself at various times during his testimony. Our standard of review prohibits this Court from overturning the trial court's credibility determinations so long as its findings are supported by the evidence of record, which in this case they are so supported. Accordingly, we adopt Judge Rogers' opinion as our own and affirm the decree appealed from on that basis.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/14/2022

- 3 -

IN RE:               :

                   :

A.G.M., A MINOR     :

                   :

                   :

                   :

                   :

                   :

IN THE COURT OF COMMON PLEAS
OF LUZERNE COUNTY

ORPHAN'S COURT DIVISION

Adoption No. A-9177

828 MDA 2022

RECORDED
11/06/2022 12:31:34 PM
JUDICIAL SERVICES & RECORDS
LUZERNE COUNTY
PENNSYLVANIA
Inst Num: 202242859

## MEMORANDUM ISSUED PURSUANT TO PA. R.A.P. 1925 (a)

## I.    PROCEDURAL HISTORY

Petitioners, ~~A.M.W.~~ , the biological mother of A.G.M., and ~~C.T.B.~~ , stepfather of A.G.M., are husband and wife, who hereafter will be referred to respectively as "Mother" and "Stepfather". On July 7, 2021, Mother and Stepfather filed a Petition for Involuntary Termination of the Parental Rights ("Petition") in which they seek to terminate the parental rights of A.G.M.'s natural father pursuant to the grounds set forth in Title 23 Pa.C.S. §2511 (a)(1).

The Court entered a Decree on April 28, 2022, terminating the parental rights of A.G.M.'S natural Father, pursuant to 23 Pa.C.S.A. §2511(a)(1). In entering the Decree, the Court gave primary consideration to the developmental, physical, and emotional needs and welfare of the child pursuant to 23 Pa.C.S.A. §2511(b).

On May 31, 2022, Father, through his court appointed counsel, filed a Notice of Appeal to the Superior Court and a Statement of Matters Complained of on Appeal as follows:

1. The Trial Court erred in finding that Petitioners proved the existence of all requisite elements of termination with respect to 23 Pa.C.S.A.§2511 (a)(1) through clear and convincing evidence;

1

2. The Trial Court erred in finding that Appellant "has evidenced for a period of six months immediately prior to the filing of [a] petition, a settled purpose of relinquishing parental claim to the minor child, A.G.M.";

3. The Trial Court erred in finding that termination of Appellant's parental rights would serve the best interests of the subject minor child pursuant to 23 Pa.C.S.A. §2511 (b);

4. The Trial Court abused its discretion and/or committed an error of law in terminating the parental rights of Appellant J.W. (sic) to the subject minor child pursuant to 23 Pa.C.S.A.§2511 (a)(1); and

5. Appellant hereby reserves the right to amend the instant document within a reasonable amount of time after receipt and review of the requested transcript.

## II.   FINDINGS OF FACT

Mother testified that she married L.T.B. ~~[redacted]~~ (Stepfather) on October 19, 2021. She indicated that she and Stepfather have a child together with initials B.T.B. Mother stated that she is also the mother of A.G.M. and that Appellant N.W.M. ~~[redacted]~~ (Father) is her biological father. Mother stated that the minor child, A.G.M. was born on July 1, 2013 in Pottsville, Pennsylvania. Mother indicated that in July 2019, a custody order was entered in Schuylkill County awarding Mother primary physical custody of the child, A.G.M., and awarding partial physical custody to Father on alternating weekends from Friday at 6:00 p.m. until Sunday at 5:00 p.m. N.T. 1/19/22 at 7-8.

Father testified that he and Mother entered into an agreement wherein Mother would enjoy primary physical custody of the child because Father did not have his

2

own place of residence. Father also believed that it was in the best interest of the minor child to live with her Mother. *Id.* at 37. Mother stated that Father exercised his partial physical custody rights from July of 2019 until January or February of 2020. *Id.* at 9. Mother testified that in the event Father needed a change in the schedule, Father would send her a text message.

Mother testified that in the beginning of March 2020, Father stopped seeing his daughter claiming that it was due to Covid. Mother stated that Father resumed exercising his weekends of custody during the first weekend of April 2020. *Id.* at 11. However, according to Mother, Father did not exercise his next period of custody commencing the weekend of April 17, 2020 and did not take custody of the child again until the weekend of August 7-9, 2020. *Id.* at 12. Mother testified that the last time Father saw the child was on August 9, 2020. *Id.* at 13. Mother testified that Father did not contact her at all in order to see the child after August 9, 2020. *Id.* at 13.

In meeting their requisite burden of proof by clear and convincing evidence regarding the termination of Father's parental rights, the petitioners, Mother and Stepfather testified on their own behalf. Father testified on his own behalf.

## III. CONCLUSIONS OF LAW

After consideration of the credible evidence as summarized above and more detailed in the Discussion section, the Court concludes:

(1) Petitioners have shown by clear and convincing evidence that the parental rights of the Father to the minor child, A.G.M. should be terminated pursuant to 23 Pa. C.S.A. Section 2511(a)(1).

(2) Petitioners have shown by clear and convincing evidence that the termination of the parental rights of Father, to her minor child, A.G.M.,

3

best serves the needs and welfare of the child pursuant to 23 Pa.C.S.A. Section 2511(b).

## IV. DISCUSSION: GROUNDS FOR TERMINATION OF FATHER'S PARENTAL RIGHTS

The statute permitting involuntary termination of parental rights in Pennsylvania, 23 Pa. C.S.A. Section 2511, sets forth the certain irreducible minimum requirements of care that parents must provide to their children.

Termination of parental rights is an issue of constitutional dimensions due to the fundamental right of an individual to raise his or her own child. Therefore, in proceedings terminating parental rights, the Petitioner must prove by clear and convincing evidence that the statutory criteria have been met. *Santosky v. Kramer*, 455 U.S. 745 (1982), *In Re: T.R.*, 502 Pa. 165, 465 A.2d 642 (1983). However, as the Pennsylvania Supreme Court has stated "a parent's basic constitutional right to custody and rearing of his or her child is converted upon the failure to fulfill his or her parental duties to the child's right to have proper parenting in fulfillment of his or her potential in a permanent, healthy, safe environment." *In Re: J.A.S., Jr.*, 2003 Pa. Super. 112, (*citing In the interest of Lillie*, 719 A.2d 327 (Pa. Super 1998)).

A court may terminate parental rights under Section 2511(a)(1) when:

The parent by conduct continuing for a period of at least six months immediately preceding the filing of the Petition has either evidenced a settled purpose of relinquishing parental claim to a child **OR** has refused or failed to perform parental duties. (emphasis added)

4

Parental duties are multifaceted. The Pennsylvania Superior Court has addressed the issue in *In re Shives*, 363 Pa. Super. 225, 525 A.2d. 801, 802 (1987) in *citing In re Burns*, 474 Pa. 615, 379 A.2d 535 (1977):

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child . . . These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child . . . the parental obligation is a positive duty which requires affirmative performance.

> This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.

> Because a child needs more than a benefactor, parental duty requires that a parent 'exert himself to take and maintain a place of importance in the child's life.'

A parent must demonstrate a continuing interest in the child and make a genuine effort to maintain communication and association with the child. *In re Adoption of McCray*, 460 Pa. 210, 331, A.2d 652 (1975). Appellate courts have set forth a very strict standard for measuring a parent's performance of parental duties. A parent must exert himself to take and maintain a place of importance in a child's life and a continuing duty to love, protect and support his child and to maintain communication and association with the child even after separation. He must pursue a course of conduct consistently aimed at maintaining the parental relationship. *In re Adoption of M.J.H.*, 501 A.2d 648 (Pa. Super. 1985); *In re V.E.* 611 A. 2d 1267 (Pa. Super. 1992); and *Adoption of S.H.*, 383 A.2d. 529 (Pa. 1978).

Mother testified that prior to the custody order of July 2019, the maternal grandparents had physical custody of the minor child although she herself lived in the same residence (N.T. at 17) and Father had alternating weekends with the minor child. Mother indicated that Father did not use his period of custody with the child even when

5

the child was in the primary physical custody of maternal grandparents. *Id.* at 17.

Mother testified that the last child support payment she received from Father occurred on August 8, 2020. Mother testified that after August 9, 2020, Father has not performed any parental duties to maintain any place of importance in the child's life. *Id.* at 22. Mother testified that she and her husband are the only two people who have been taking care of the minor child. *Id.* at 16. Mother testified that Father gave a card and gifts to his daughter only one time at Christmas of 2020 by mailing the same to the Maternal Grandparents' residence. Mother stated that even though Father knew her home address, he, nevertheless, mailed the card and gifts to the maternal grandparents' residence. *Id.* at 22.

Mother further testified on cross examination that even though Father stated that he did not have any contact with the child in March 2020 due to Covid, Father did not need to stop all contact with the child. Mother stated that Father could have taken the initiative to call his daughter. *Id.* at 19. Mother indicated that from August 2020 until the filing of the petition to terminate Father's parental rights on July 7, 2021, she was never contacted by the state police regarding Father's attempt to enforce his custodial rights with the minor child. Mother further stated that she was not served with any legal pleadings concerning Father's attempt to enforce his custodial rights. Mother also stated that she did not have any court hearings pertaining to the minor child between August 2020 and July 7, 2021. *Id.* at 30.

On cross examination, Mother denied that when she had primary physical custody of the minor child she prohibited Father from seeing the minor child. Mother testified that when Father texted her subsequent to the entry of the custody Order in July of 2019, she responded to his messages. Mother denied blocking Father's phone

number on her cell phone. *Id.* at 18. Mother testified that she had the same cell phone number and same home address from July 2019 until the present. Father had both Mother's cell phone number and Mother's home address. *Id.* at 10.

Stepfather indicated that there were regular visits between Father and the minor child subsequent to the entry of the custody order in July of 2019. Stepfather further stated that he accompanied Mother on most custody exchanges, including the visits on the weekends of April 3, 2020 and August 7, 2020. *Id.* at 32-33. Stepfather further confirmed that he did not have any personal knowledge of any attempt by Father to see the child between August 9, 2020 and July 7, 2021. Stepfather further stated that Father never appeared at his house requesting to see the child. Stepfather confirmed that the state police never appeared at his house stating that Father was attempting to enforce his custody rights.

Stepfather testified that when Father did not see the minor child in March 2020, Mother did not attempt to stop the visits between Father and the minor child. *Id.* at 33. Stepfather further stated that he and Mother never denied Father any visits with the child. Stepfather further testified that he never had any direct contact with Father. *Id.* at 34. Stepfather corroborated Mother's testimony by stating that between August 2020 and July 7, 2021, he and Mother did not move from their residence known to Father and Mother did not change her telephone number. *Id.* at 34.

Father testified that he visits with his daughter during his custodial period every other weekend "when he's able to." Father testified that about eighty (80%) percent of the time, he was not able to enjoy his weekends with his daughter because he was only able to pick her up from Saturday night until Sunday as the child would have counseling on Saturdays. Father stated that at times the child would be busy during

7

his period of custody enabling him to see the child for only one night. *Id.* at 36-37.

Father stated that he tried to contact Mother's family members in order to see the minor child, but was unsuccessful. *Id.* 39-40. He called the maternal grandmother and left a voicemail on the minor child's birthday in 2021. *Id.* at 41.

Father indicated that he complained to the state police a few times in Schuylkill County when Mother refused to allow him to have contact with a minor child. According to Father, the last time he complained to the state police was upon being served with a petition to terminate his parental rights. When questioned as to the other times that he complained to the state police, Father was not able to recall. *Id.* at 42-43.

Father testified that he consulted with an attorney to address his custody issues; however, due to his limited finances and having to raise another child, he was not able to afford an attorney. Father indicated that he met with an attorney at North Penn Legal Services, but was not able to retain counsel. Father stated that he also met with several other attorneys, but was not able to afford their fee. *Id.* at 43. Father was questioned on cross examination as to the date that he met with an attorney regarding his case and Father was not able to recall the date, but stated that the meeting was over the phone. When questioned as to the time period that he called potential counsel, Father was not able to recall the dates, but believed that the time frame was one year prior to the hearing. *Id.* at 66. When questioned as to whether the minor child was ever provided with a telephone number to contact her Father, Father stated that he did not provide his daughter a telephone number because she was only six or seven years old. *Id.* at 67.

Father acknowledged that he had Mother's telephone number; however, he did

8

not have it memorized. *Id.* Father testified that between August 2019 and July 2021, he attempted to call Mother on her cell phone number; however, he would receive her voicemail. Father believed that his number was blocked. *Id.* at 39. Father further stated that he believed that he left a message on the voicemail. *Id.* at 66. Father testified that during that time frame, he attempted to telephone Mother on the child's birthday and also on weekends. Father stated that he also attempted to text Mother during that time, but did not receive any response.

On cross examination, Father contradicted his testimony by acknowledging the opposite. Father acknowledged that he exercised his custodial periods with the child from the month of July 2019 through March of 2020 and there were no issues between him and Mother. *Id.* at 50. Father further acknowledged that he chose not to see the child in March 2020 due to Covid.

Father then stated that he did see the child the weekend of April 3, 2020 and also the weekend of August 8, 2020. *Id.* at 51. Father then acknowledged that he had not seen the minor child since August 9, 2020. *Id.* at 52. Father admitted on cross examination that from August 2020 until July 2, 2021, he did not see the minor child but, "not by my choice ". *Id.*

Father further admitted that between August 2020 and July 2021 he did not perform any parental duties for the minor child. *Id.* at 60-61. Father admitted that he has not provided for his daughter's emotional needs, physical needs, spiritual needs, intellectual needs, and medical needs since August 9, 2020 until the present. *Id.* at 61.

The Court finds that based upon the testimony adduced at trial, Father's testimony was inconsistent and not credible. Furthermore, this Court finds that Father

9

has refused or failed to perform his parental duties in excess of six (6) months prior to the filing of the Petition for Termination of Parental Rights. Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Title 23 Pa.C.S.A § 2511 (b). *In re: Z.S.W.*, 946 A.2d 726, 730 (Pa. Super. 2008)

With grounds for termination under Title 23 Section 2511 (a)(1), **the first line of inquiry** as aforementioned, is the parent's explanation for his or her conduct. Father stated on cross examination that he was incarcerated from August 12, 2020 until October 8, 2020. *Id.* at 57. Father further admitted on cross examination that at his last visit with his daughter on August 9, 2020, he never disclosed to Mother, nor his daughter that he was not exercising his upcoming custodial periods with the child due to an approaching period of incarceration. The court, therefore, finds that Father was not able to enjoy periods of custody of child between August 12, 2020 and October 8, 2020 due to his incarceration and not because Mother prohibited him from doing so. *Id.* at 58-59.

Father testified on direct examination that following his incarceration, he stayed at a rehabilitation center at the Salvation Army in Harrisburg, Pennsylvania from October 8, 2020 until April 2021. *Id.* at 53. Father stated that he did not inform Mother of his rehabilitation at the Salvation Army. *Id.* at 57, 59. Father claimed that Mother was aware that he was at the Salvation Army because she had called his counselor and left a message on the counselor's voicemail. *Id.* at 59. Despite Father's

statement, Father did not produce the counselor as a witness to substantiate his statement.

Father stated that he participated in the program at the Salvation Army for six (6) months in order to take control of his life. *Id.* at 53-54. Father stated that he was able to come home on weekends wherein he tried to contact the minor child, but was unsuccessful. *Id.* at 54. Father stated that prior to his last visit with the child in August 2020, both he and his wife owned a cell phone. Subsequent to August 2020, Father stated that he could no longer afford to have a cell phone. Father stated that even though he did not have a cell phone, he tried calling his daughter from the Salvation Army. *Id.* at 56. Father stated that he was also using his wife's cell phone because he did not have his own cell phone. Father admitted on cross examination that Mother could not have blocked his telephone number on or around August 2020 because he did not have a cell phone. *Id.* at 60. Father then claimed that Mother also blocked his wife's telephone number. *Id.* at 64.

Father testified that he contacted Mother in order to speak to the child by using his wife's cell phone number. He stated that he has been using that telephone number for over a year. He indicated that he spoke with Mother and the child using his wife's telephone number. *Id.* at 75. Father introduced telephone records showing his telephone calls or text messages made to the Mother; however, the records did not verify that any of his calls or text messages were blocked.

Father stated on cross examination that he called the Schuylkill County Prothonotary's Office in order to retrieve custody forms. However, he did not attempt to complete them, but rather took the forms to an attorney. *Id.* at 63. Father then stated that he was not able to afford an attorney, but he did not attempt to complete

11

the custody forms himself. He, therefore, did not file any documents in court in order to enforce his custody rights. *Id.*

Father stated that he paid child support in the amount of $210.00 biweekly for the minor child through wage attachment. *Id.* at 46. Father further admitted that his wages were only attached once for the payment of child support. *Id.* at 61. Father stated that when he lived at the Salvation Army, his child support payment was stopped and then he was able to make a couple of payments after he tried to reinstate it. *Id.* at 62.

Father stated that he did not know where the child resided with Mother. He indicated that in December 2021, when he mailed the child's presents to the maternal grandparents' residence, he was then residing at the Salvation Army. *Id.* Father admitted on cross examination that from August 2020 until July 2021, he did not have any relationship with his daughter.

Father stated on cross examination that he was remarried in May 2021. Father stated that he did not invite his daughter to the wedding because Mother would not answer her telephone, yet Father could have contacted the maternal grandmother in order to reach the child or the Mother. Father further admitted on cross examination that he had used illegal substances in the past, but denied that he had substance abuse issues. *Id.* at 65. Father admitted that when he was incarcerated and stayed at the Salvation Army, he did not see his child from August 12, 2020 until April 2021. Father stated that he wanted to become a better person through the program that he attended at the Salvation Army. *Id.*

Father stated that on June 30, 2021, he called to speak to the minor child to wish her a happy birthday, but he believed that his number was blocked. He did not,

12

however, send any text messages for the child. He stated that he texted Mother for his upcoming weekends with the child; however, Mother would just ignore his texts. *Id.* at 49.

Father was questioned as to whether during his incarceration, he attempted to contact Mother or the child or the child's maternal grandparents. Father indicated that he did not personally try to contact them; however, he was able to speak to his child when his child was at his family's residence. *Id.* at 77-78. Father stated that while he was staying at the Salvation Army between October of 2020 and April of 2021, he tried to contact his minor child several times on Christmas and Thanksgiving and mailed her presents as well in Christmas of 2020. *Id.* at 78.

Father stated that at his last custody period with the child in of August 2020, he was able to give the minor child her present and placed it in a book bag. However, he would not let the minor child take the presents with her to her Mother's home. Father was questioned on cross examination as his rationale for that action since he knew he was to be incarcerated three (3) days later. Father then changed his testimony and stated that he gave his daughter the option to take the book bag with her. *Id.* at 94.

However, Father stated that he kept the minor child's presents for the year 2021. *Id.* at 91. Father's testimony again was inconsistent from his prior testimony. Father first stated that he had the child's birthday presents for the year of 2020 and 2021. Later, Father changed his testimony by stating that he only gave the presents to the child for the year 2020 and kept the presents from the year 2021 at his residence. *Id.* at 92.

With respect to the Father's incarceration, Father had testified that he was incarcerated between August 12, 2020 and October 8, 2020. The court recognizes that

13

this time frame falls outside of six months from the filing date of the Petition to Terminate his parental rights on July 7, 2021. However, the Court is also cognizant of supporting case law, which directs the Court not to mechanically apply the statutory six-month requirement in forfeiting Father's parental rights. *In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super. 2010) The Court considered the history of the case and carefully examined Father's circumstances in being incarcerated and determined that is case still warrants the involuntary termination of his parental rights.

The Pennsylvania Supreme Court has addressed the effect of a parent's incarceration in the context of a termination of parental rights proceeding as follows:

> "This Court has never adopted or countenanced a view that incarceration alone is per se evidence of parental incapacity or that it represents appropriate and sufficient grounds for the involuntary termination of parental rights. Indeed, the law in Pennsylvania is quite the opposite, and we reiterate the definitive principle that when a parent uses the opportunities that are available in prison to make sincere efforts to maintain a place of importance in the lives of his or her children, incarceration alone will not serve as grounds for involuntary termination of Father's parental rights." *In re R.I.S. & A.I.S.*, 36 A.3d 567, 574 (Pa. 2011)

The Court further explained that the court must inquire as to whether the parent had utilized resources at his or her command while in prison in pursuing a close relationship with the child or children. 36 A.3d 567, 573 (Pa. 2011) (*citing In re Adoption of McCray*, 460 Pa. 210, 331 A.2d, 652, 655 (Pa. 1975). An incarcerated parent who wishes to retain parental rights must exert himself or herself to take and maintain a place of importance in the child's life. *Id.*

In the case of *In re R.I.S. & A.I.S*, there was abundant testimony and evidence presented by Father evidencing that he had utilized resources while in prison in pursuing a close relationship with his children. Specifically, Father maintained contact

14

with the children by sending them cards on a monthly basis, by participating in a "Reading to Your Children" program involving the children receiving a video of Father reading a book to them. Father also requested visitation with the children, but was denied due to time and distance from the facility. Furthermore, Father's request for "virtual visitation" was denied because Children and Youth did not have video conference capability. Father also purchased a pre-paid phone card and attempted several times to contact the children; however, the foster parents refused the calls. 36 A.3d 567, 570 (Pa. 2011)

Unlike the Father in the *In re R.I.S. & A.I.S* case, the Father in the case at bar did not utilize his resources while in prison to pursue a close relationship with his minor child. In fact, Father only spoke to his child once over the telephone while he was incarcerated. N.T. 1/19/22 at 83. While he was incarcerated, he did not make any additional attempts to contact Mother or the maternal grandmother in order to speak to his child or attempt any type of visitation with the child. He did not financially support the minor child in any manner but only paid child support for a limited period of time. He did not send the minor child cards, gifts, letters on her birthday or holidays. He never made any consistent contact with the child. *Id.* at 62, 87-90.

Therefore, while in *In re R.I.S. & A.I.S*, the Father exerted himself and utilized resources to maintain a place of importance in his child's life while incarcerated, the Father in the instant case, did not exert himself whatsoever, nor did he utilize resources to maintain a place of importance in his child's life.

In the instant case, as stated above, the Father had no contact with the minor child in excess of six months prior to the filing of the petition for termination of parental

15

rights on July 7, 2021. The Court finds that Father has refused or failed to perform any parental duties since August 9, 2020.

Father testified that Mother did not give him the opportunity to participate in decisions pertaining to the child's spiritual needs, medical needs, educational needs and day-to-day activities. However, Father also admitted that he did not ask Mother about participating in those types of decisions. *Id.* at 81.

Father stated that after his last period of custody in August 2020, he only spoke to his daughter one time over the telephone while he was incarcerated when the child was visiting his wife and the paternal grandmother. *Id.* at 83. Father was questioned on cross examination as to the reason that he did not request Mother's address from the maternal grandmother as he had her telephone number. Father was also questioned as to the reason he did not attempt other means, in the form of a letter, to request information regarding the child. Father simply responded that he requested that the minor child call him. *Id.* at 89.

Father, toward the end of his testimony, stated that at times the Mother's voicemail would indicate that her number was not available or not accepting calls at the time; and therefore, there was no option on these occasions to leave a voicemail for Mother. *Id.* at 97. This Court noticed that at first Father stated that he called Mother, but Mother would not answer and that his calls would be sent to voicemail. Then Father stated that he believed that his number was blocked. Then Father testified that he did not have a cell phone and that he used his wife's cell phone. Then Father stated that Mother's voicemail stated that she was not accepting phone calls and that she blocked his phone number and his wife's number.

Contrary to Father's testimony, Mother testified that she never received a voicemail from Father. She indicated that she does not have Father's telephone number blocked on her phone. She stated that she does not have a blocked voicemail or a full voicemail on her cell phone. Mother stated that there is always an option to leave a message on her voicemail and that she never received a voicemail message from Father. Mother further stated that she has "Caller ID". She stated that she never received a phone call from Father from any rehabilitation center, nor did she receive a telephone call from Father from his place of incarceration. She stated that Father did not reach out to her to engage in any communication with her at all regarding the minor child. *Id.* at 104-105.

Again, this Court reiterates that Father could have contacted the maternal grandmother via telephone or via mail requesting that Mother call him or simply requesting Mother's address if it was not in his possession. Father stated that he attempted to contact the child's pediatrician; however, he was not permitted to speak to the doctor and believed that Mother placed him on a "no contact list". Father was aware that he had shared legal custody through the custody Order yet he never stated whether he advised the pediatrician's office of his shared legal status. *Id.* at 68. Father indicated that when his child relocated two hours away to another school district in Luzerne County, he was unaware of her school activities. This Court notes, however, that due to Father's shared legal status pursuant to the applicable custody order, Father had the capability to request the information himself from the school. Father stated that he believed that parents should co-parent and inform the other parent about their child. *Id.* at 70. While Father's assertion as to co-parenting may be accurate, Father still had a duty to be proactive and make a diligent effort to be involved in his child's life.

17

Father indicated that he did not attempt to file a petition for contempt or a petition to modify the custody order because he did not know how to proceed. He stated that he contacted a worker in Lebanon County Courthouse because he pays child support in that county. Father explained that the custody order is in Schuylkill County even though Mother and the child lived in Luzerne County. Father explained that no worker in Lebanon county was able to give him any guidance. *Id.* at 44.

The Court finds that due to Father having shared legal custody pursuant to a custody order, he had the opportunity to obtain information regarding his child from the child's school and the child's pediatrician. Eventhough Father was looking to "better himself", he cannot put his child "on hold" and then pick up where his left off in excess of six months. As the Superior Court provided in *In Re: I.J.* 972 A.2d 5, 11-12 (Pa. Super. 2009), "a child's life cannot be held in abeyance while the parent is unable to perform the actions necessary to assume parenting responsibilities. The Court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claim of progress and hope for the future." Children need to be nurtured and protected and the bond that a parent may have with a child needs to be preserved. This Court does not find Father's testimony to be credible, nor compelling. On the contrary, this Court finds Father's testimony to be rather inconsistent and displays a lack of accountability for his actions.

Mother was questioned on cross examination as to whether she should have reached out to Father in order to set up a visitation schedule. Mother responded that she should not have to reach out to Father in order to have contact with his daughter. According to Mother, Father should be the one reaching out to see his daughter. This Court agrees with Mother's rationale in believing that Father should be the one to reach

18

out to his daughter. Father is an adult and it is his duty to maintain a relationship with his daughter. Although Father stated that he attempted to contact Mother for that purpose and that his number was blocked, the Court does not find Father's testimony to be credible. *Id.* at 104-105.

Mother testified that when the minor child visited her Father, she enjoyed going to his home in order to play with her cousins. Mother stated that the child had told her that Father would be sleeping during her visits with him. *Id.* at 106. Mother stated that there were times when she reached out to the paternal grandmother and asked if she would like to see the minor child; however, the paternal grandmother would refrain from doing so stating she did not have any money for gas. Mother stated that the paternal grandmother never contacted her in order to see the minor child. Mother also stated the paternal grandmother never contacted her on behalf of Father in order to see the minor child. *Id.* at 109.

Stepfather stated that he never discouraged the minor child from having a relationship with her Father. *Id.* at 120. Stepfather indicated that when the minor child used to visit her Father, she stated that she only hung out with her grandmother and her cousins. The child would state that her Father would either be sleeping or at a bar all night with his friends. *Id.* at 121.

Father admitted that he did take naps when the minor child visited him because he was working two jobs. He stated that the minor child would play with her cousins while he was at work or at his mother's house. *Id.* at 125. Father stated that he would go play softball with her and her cousins and that he would take her fishing and to the park as well as the movies. They would also go to church together. This Court notes that

19

although Father engaged in these activities with his daughter, he did not continue engaging in these activities approximately for one year.

Specifically with respect to the relevant six (6) month period at issue in the Section 2511 (a)(1) analysis, Father did not provide sufficient reasons for his inability to perform his parenting duties during the relevant six-month period and beyond. Termination of his parental rights is warranted.

The **second line of inquiry** is the post-abandonment contact between parent and child. Both mother and Father indicated that the last time Father saw the child was on August 9, 2020. Therefore, between August 9, 2020 and July 7, 2021 (the date of filing of the petition to terminate Father's parental rights) an excess of six months had elapsed wherein Father had not seen the child. Thus, there is credible and uncontradicted testimony given by Mother, Stepfather, and even Father himself that there has been minimal post-abandonment contact between Father and the minor child, and that Father did not have sufficient contact with the child for well beyond the requisite six (6) months prior to filing the Petition for Termination of Parental Rights.

The **third line of inquiry**, as stated in *In re: Z.S.W.* requires the Court to review the evidence in support of termination under Title 23 Pa.C.S.A Section 2511 (b). The Court must determine whether the termination of parental rights would best serve the developmental, physical and emotional needs and welfare of the child. *In re C.M.S.*, 884 A.2d 1284, 1286-87 (Pa. Super. 2005). "Intangibles such as love, comfort, security and stability are involved in the inquiry into the needs and welfare of the child." *Id.* at 1287. The court must also discern the nature and status of the parent-child bond, with utmost attention to the effect of permanently severing that bond on the child. *Id.*

20

Mother testified that Stepfather has known the minor child for four and a half (4 ½) years. She stated that the child has lived with her and Stepfather since August 2019. According to Mother, the child accepts Stepfather as a Father figure. Mother indicated that the child calls Stepfather "Dad ". *Id.* at 100. Mother testified that Stepfather treats the minor child as if she is his own child. He takes her and picks her up from cheerleading practice and he also takes her to camp. Mother indicated that the minor child and Stepfather have a very close bond. She began calling him "Dad" approximately one and one half years ago. Mother indicated that Stepfather meets the child's needs. *Id.* at 101.

Mother indicated Stepfather is willing to adopt the minor child. She believes it is in the child's best interest for Stepfather to adopt the child. Mother described the child as "looking up to" Stepfather. Mother stated that the child has asked for Stepfather to adopt her. *Id.* at 102.

Mother testified on cross examination that there came a time when the child stopped calling the natural Father "Dad", but that she nor Stepfather ever told the child to stop calling the natural Father "Dad". *Id.* at 103. Mother believes that since Father was not present for the child for a significant period of time, the child began seeing her Stepfather in the role of a father figure. Mother believes that the minor child is mature enough to recognize the role of a Father. *Id.* at 104.

Mother testified that she did not believe there was any bond between Father and the minor child due to lack of contact existing between Father and the minor child. *Id.* at 111-112. Mother also indicated that the child never asks about her Father. Mother stated that in the past when Father was exercising his custodial rights, the child used to tell her that her Father always slept during her visits with

21

him. *Id.* at 112. Mother further stated that the minor child did not want to see her Father and had not expressed any interest in seeing her Father in quite some time. *Id.* at 20-21. Mother stated that although the child knows that Father is her natural Father, she calls him "███████" and she calls her Stepfather, "Dad". *Id.* at 20. Mother explained that at first, the minor child wanted to have a relationship with her Father; however, as time passed she no longer desires that relationship. *Id.* 25.

Stepfather stated that he began living with Mother and the minor child in August 2019 and that he provides for the child's physical needs through the provision of shelter, food and clothing. He takes her to doctor's appointments, as does Mother. He also takes her to the dentist. *Id.* at 115-117.

Stepfather also indicated that he provides for the child's developmental needs, by helping her with her homework. He also plays "trivia" with the child and other games to improve brain activity. He and the child also practice softball together. He also plays basketball with the child outside and he takes her hunting and fishing.

Mother indicated that the minor child has been undergoing therapy for approximately two years. Mother testified that the minor child would become violent and stomp her feet. Mother explained that the child's behavior was the result of child's relationship with her Father. Thus, therapy has helped the minor child improve her behavior. *Id.* at 24. Mother further stated that the minor child's grades have also improved from having mostly D's to having mostly A's and a few B's over a period of one year. *Id.* at 26.

Stepfather stated that he provides for the minor child's emotional needs. He stated that the minor child receives the attention that she needs. *Id.* at 115. Also, when the child becomes upset she comes to Stepfather for comfort. According to Stepfather,

he believes that he has a very strong bond with the minor child. He described the bond as very loving and very close. Stepfather further indicated that he loves the minor child and she loves him. He believes that the minor child views him as a Father figure. He indicated that a little over three years ago, the minor child began calling him "Dad" and progressively the reference became more frequent over the past one and one half years. Stepfather stated that the child asked him if he minded that she called him "Dad" and he told her to call him whatever she wanted. Stepfather testified that he treats the minor child as if she is his own and treats her as an equal to his biological child with Mother. According to Stepfather, the minor child is very happy and he wishes to adopt her.

The court finds that Father did not make a legitimate effort to maintain the bond that he had with his daughter since August 9, 2020. The court further finds that Father did not make an effort to nurture the relationship between him and the minor child. Father expected the bond that he had with his daughter to remain intact despite his lack of attention to her. *Id.* at 126. Father admitted that there was no bond between him and the child at the time of the hearing; however, Father justified the lack of bond by stating that it was "not by my choice."

However, the court finds that Father did have a choice. Father could have contacted the maternal grandmother more often either by calling her or writing to her if he was not able to get in touch with Mother. According to Mother, she did not receive any phone calls from Father. The Court does find Mother's testimony to be more credible than Father's testimony with respect to lack of attempt of contact by Father. Father also had additional opportunities to file necessary documents in court in order to exercise his physical custody rights. Father had shared legal custody pursuant to a custody order which would have given him access to obtain information from the child's

school, as well as from the child's pediatrician without the need to ask Mother for information. The Court finds that it was Father's choice not to request the information regarding his daughter. The Court finds that the child's physical needs, developmental needs and emotional needs are met by the petitioners, Mother and Stepfather.

## V. ADDITIONAL CONSIDERATIONS UNDER 23 P.A.C.S.A. SECTION 2511(b)

### A. ENVIRONMENTAL FACTORS

Title 23 Pa. C.S.A. Section 2511(b) specifies that a court may not terminate parental rights "solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing, and medical care if found to be beyond the control of the parent."

"[E]nvironmental factors beyond the control of Father" was not the linchpin in the termination of Father's parental rights; instead, there were independent factors leading to the termination of Father's parental rights; therefore, this consideration does not apply and will not be addressed.

### B. NEEDS AND WELFARE OF THE CHILD

Once the Court has found that involuntary termination of parental rights is warranted under the Act, the court must then "give primary consideration to the developmental, physical and emotional needs and welfare of the child." This is to be a separate inquiry and even where the court has already considered the needs and the welfare of the child under one of the grounds of termination, the court must do so again. *In re Matsock*, 611 A.2d 738 (1992).

The Court has done this and finds the same considerations apply that have already been discussed extensively in this memorandum. Furthermore, the Court

24

applies the same reasoning for concluding that these needs will be served by the termination of Father's parental rights.

## VI. CONCLUSION

Finally, the Court notes that the Guardian *Ad Litem* for the child recommended that it is in the child's best interest to terminate the parental rights of Father to the minor child.

The Court finds that Father is not and has not been able to meet the child's needs. In stark contrast, Mother and Stepfather have amply demonstrated that they continue to meet the child's physical, developmental and emotional needs and that the minor child has thrived under their care. The minor child needs and deserves a paternal figure in life that will supply proper nurturing, love, guidance and security. Termination of the parental rights of the Father is supported by clear and convincing evidence. Clearly, it is in the minor child's best interest to do so.

Respectfully submitted,

BY·THE COURT,

JENNIFER L. ROGERS                    J.

DATE: 7/6/22

COPIES TO:

Michael Beltrami, Esquire
477 South Church Street
Hazleton, PA 18201

Louis J. Mattioli, Esquire
4285 Hollywood Blvd
Hazle Township, PA 18202

Jessica L. Pleskach, Esquire
1170 Highway 315, Suite 1
Plains, PA 18702